# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

ALLIANCE FOR FAIR AND
EQUITABLE CONTRACTING TODAY,
INC.,

     *Plaintiff*,

v.

METROPOLITAN TRANSPORTATION
AUTHORITY,

and

PATRICK J. FOYE, in his official
capacity as Chairman and CEO of the
Metropolitan Transportation Authority,

     *Defendants.*

Case No. _____

## VERIFIED COMPLAINT SEEKING DECLARATORY AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

Plaintiff Alliance For Fair and Equitable Contracting Today, Inc. (AFFECT) brings this Complaint against Defendants Metropolitan Transportation Authority (MTA) and Patrick J. Foye, in his official capacity as Chairman and CEO of the MTA, and alleges as follows:

### PRELIMINARY STATEMENT

1.     This is an action to enjoin and declare unconstitutional under federal law a draconian contractor debarment regime put in place by the New York legislature and the MTA, culminating in publication of renewed "emergency" regulations in the New York State Register on November 6, 2019.

2.       In April 2019, a new MTA debarment law was slipped into the New York State budget bill, N.Y. Senate Bill S1509c (January 18, 2019), and passed without public comment or debate.  The bill was codified as N.Y. Pub. Auth. Law § 1279-h (the Debarment Statute).

3.       The Debarment Statute required the MTA to establish through regulation a debarment process for contractors working with the MTA.  The statute required the implementing regulations to mandate a five-year period of debarment (i) if a contractor fails to complete a project "within the time frame set forth in the contract, or in any subsequent change order, by more than ten percent of the contract term" or (ii) if a contractor claims costs later deemed to be "invalid" by ten percent or more "pursuant to the contractual dispute resolution process."

4.       After issuing "emergency" regulations in June 2019, which were then extended on August 19, 2019, the MTA again extended the "emergency" regulations on October 18, 2019, although they were not published until November 6, 2019.  *See* N.Y. Comp. Codes R. & Regs. tit. 21, § 1004, *et seq*. (the MTA Regulations).  The MTA Regulations apply both prospectively to new contracts and retroactively to all contracts already in existence—not just before issuance of the first emergency regulations, but also before passage of the Debarment Statute itself.

5.       The MTA Regulations require a five-year period of debarment if a contractor (a) fails to substantially complete all work under the contract by more than ten percent of the total adjusted time frame; (b) merely appears, in the sole view of the MTA, to be in danger of failing to do so, if such failure is an event of default under the contract; or (c) even *attempts* to assert claims for costs in excess of ten percent of the total adjusted contract value that are later deemed to be invalid.  The MTA Regulations do not permit the agency any discretion whatsoever in applying these requirements—even in the face of compelling and undisputed

facts showing that the contractor acted in good faith, or that the debarment would be unfair or contrary to the public interest.

6. To compound matters, the MTA Regulations permit the MTA to debar not only the targeted contractor but also the "parent(s), subsidiaries, and affiliates" of a targeted contractor, as well as the targeted contractor's "directors, officers, principals, managerial employees, and any person or entity with a ten percent or more interest in a contractor," as well as "any joint venture (including its individual members) and any other form of partnership (including its individual members) that includes a contractor or a contractor's parent(s), subsidiaries, or affiliates of a contractor." *Id*. §1004.6(b). The MTA may debar these entities and persons even if their relationship to the targeted contractor has nothing to do with the conduct (or even the same contract) that led to the debarment in question.

7. Debarment is the death penalty for a public works contractor, and not just in New York. A debarment by the MTA could result in debarment nationwide, given that public and private contractors throughout the country commonly inquire about bidders' debarment history when considering project bids. The Debarment Statute and MTA Regulations thus effectively export an unreasonable law not only throughout New York State, but to all other states as well.

8. The Debarment Statute and MTA Regulations are unconstitutional under federal law for a host of reasons. They violate the Contract Clause, by purporting to substantially modify the terms of contracts in existence at the time of their passage. They violate the Supremacy Clause, because they conflict with and undermine federal objectives associated with federal grants. They violate the Dormant Commerce Clause, by imposing an unreasonable burden on interstate commerce. They violate procedural and substantive Due Process, because they fail to provide adequate notice and opportunity to be heard and create radical standards for

debarment.  And they violate the right to petition the government embodied in the First

Amendment, because they have a chilling effect on contractors' willingness to pursue available

claims in good faith.

9.      For all of these reasons, this Court should declare both the Debarment Statute and

the MTA Regulations unconstitutional under federal law and issue both a preliminary and

permanent injunction preventing Defendants from enforcing either source of law.

## PARTIES

10.      Plaintiff AFFECT is a New York not-for-profit organization that represents and

serves five member associations, who in turn represent thousands of construction contractors,

engineers, and related companies.  AFFECT has a principal place of business in Melville, New

York.  AFFECT is comprised of five member organizations: the General Contractors Association

of New York, the New York Building Congress, the Associated General Contractors of New

York State LLC, the Building Trades Employers Association, and the American Council of

Engineering Companies of New York.  AFFECT advocates for fair and equitable contract terms

from public agencies in New York State.  This includes advocating for changes in existing

statutes, advocating for new statutes, advocating for changes in agency regulations and agency

contract management procedures, possible litigation, and educating the public about the cost and

impact of unfair contract terms.

11.      Founded in 1909, the General Contractors Association of New York (GCA) is a

trade association exclusively devoted to the issues facing heavy construction contractors in New

York City.  GCA's members collectively employ more than 20,000 unionized tradespeople.

GCA's mission is to promote the role of heavy construction owners, trades, and the services that

support them in New York City and New York State.  GCA advocates for its members to

support effective changes in bidding and contracting processes and otherwise advance issues of importance to the industry.

12.     Founded in 1921, the New York Building Congress (the Building Congress) is a broad-based membership trade association committed to promoting the growth and success of the construction industry in New York City and its environs.  The Building Congress has more than 500 constituent organizations who employ more than 250,000 skilled tradespeople and professionals.  Its missions include supporting sound public policy, promoting productive capital spending, encouraging public/private partnerships, and evaluating the implementation of major government projects.

13.     The Associated General Contractors of New York State (AGC NYS) is a trade association based in Albany, New York.  AGC NYS is a leading voice of the building and highway heavy construction industry, representing contractors and related companies dedicated to the ideals of skill, integrity and responsibility.  AGC NYS represents about 200 general contractors and construction managers throughout the State of New York who perform the majority of building construction, highway heavy constructions, municipal, and utility work throughout the State.  AGC NYS monitors and pushes for legislation that benefits its members and works proactively for legislative changes that will benefit the industry.

14.     The Building Trades Employers Association of New York (BTEA) is a unified advocate for construction contractors on issues of construction safety standards, professional development, government affairs, public relations, and fostering communication between public officials, public and private owners, labor, and the general public.  The BTEA represents 26 construction manager, general contractor, subcontractor, and specialty trade contractor associations with over 1,300 individual contractor members.  Its member associations range in

size from multi-billion dollar internationally recognized firms to small and mid-sized specialty subcontractor firms.  The projects these companies collectively build include roads, bridges, and government facilities.  In 2017, BTEA contractors had an estimated $40 billion in construction revenue.

15.     Founded in 1921, the American Council of Engineering Companies of New York (ACEC New York) is an industry association based in Albany, New York that represents and serves over 300 engineering and related firms, ranging from small firms to large national and multinational engineering and related companies.  ACEC New York's members include firms engaged in every discipline of engineering related to the build environment, including civil, structural, mechanical, electrical, environmental, and geotechnical engineering and construction.  ACEC New York's mission is, among other things, to promote the business interests of member firms through networking, advocacy, education, and business services.  It has authority to file lawsuits and/or engage in activities to promote the greater interests of its constituent members.

16.     Defendant MTA is a public-benefit corporation charted by the New York State Legislature in 1965.  The MTA constitutes North America's largest transportation network, serving a population of 15.3 million people across a 5,000 square-mile travel area surrounding New York City, Long Island, southeastern New York State, and Connecticut.  The MTA comprises six agencies:  MTA New York City Transit, MTA Bus Company, MTA Long Island Rail Road, MTA Metro-North Railroad, MTA Bridges and Tunnels, and MTA Capital Construction.  The MTA maintains its headquarters and principal place of business at 2 Broadway, 4th Floor, New York, New York 10004.

17.     Defendant Patrick J. Foye is the Chairman and CEO of the MTA and is responsible for overseeing critical agency priorities and the agency's day-to-day management.

He maintains his offices at 2 Broadway, 4th Floor, New York, New York 10004.  Mr. Foye is sued in his official capacity only.

## JURISDICTION AND VENUE

18.     Jurisdiction in this Court is grounded upon and proper under 28 U.S.C. § 1331, in that this civil action arises under the laws of the United States; 28 U.S.C. § 1343(a)(3), in that this case seeks to redress the violation of AFFECT's and AFFECT's members' rights guaranteed by the United States Constitution and federal law; and 28 U.S.C. §§ 2201–2202, in that there exists an actual justiciable controversy as to which Plaintiff requires a declaration of its rights by this Court and injunctive relief to prohibit Defendants from violating laws and regulations.

19.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (e) because this is a civil action in which Defendants maintain their offices and conduct business in this judicial district.  Moreover, a substantial part of the events giving rise to the claims occurred within this judicial district.

20.     Plaintiff has standing to bring this lawsuit because the contractors who are members of its member organizations are suffering and face imminent actual injury as a result of the challenged statute, regulations, and EO.  This lawsuit seeks to vindicate interests that are germane to both AFFECT and its member organizations' purposes; a critical mission of all such entities is to protect their members' interests in connection with policy changes affecting public works contracts initiated by MTA and the State of New York.  There is no need for Plaintiff's members to sue directly, given that there are no individualized issues presented, and Plaintiff is not seeking damages on behalf of its members.

## FACTUAL BACKGROUND

21.     The MTA and its family of agencies—MTA New York City Transit Authority,

MTA Long Island Rail Road, MTA Metro-North Railroad, MTA Capital Construction, MTA

Bridges and Tunnels, and the MTA Staten Island Railway—operate and maintain the subways,

buses, commuter railroads, and inter-borough toll crossings in and around New York City.  *See*

About Us, https://new.mta.info/about-us.  (Exhibit 1.)

22.     The MTA awards some of the largest and most complex government contracts in

the State of New York.  For example, the MTA has solicited bids for 128 capital projects valued

at $823 million between September 2019 and August 2020.  *See*

http://web.mta.info/mta/capital/pdf/eotf_0919_0820.pdf.  (Exhibit 2.)  And the MTA recently

announced a $54.8 billion plan to overhaul New York City's public transit network.  *See* MTA

Board Approves Proposed 2020-2024 Capital Plan (Sept. 16, 2019), http://www.mta.info/press-

release/mta-headquarters/mta-releases-proposed-2020-2024-capital-plan-directing-historic-

level.  (Exhibit 3.)

23.     Because a number of the public work projects overseen by MTA are funded at

least in part through federal grants, mandatory federal requirements governing federal grants

apply to the underlying contracts that MTA awards to contractors for those projects.  Current

MTA projects receive billions of dollars in federal grant funds in total each year, and hundreds

of millions of additional federal funds are up for bid in the next few months alone.  *See* MTA,

https://www.usaspending.gov/#/recipient/3a338d8b-082d-d4b1-e5be-cba60d0ceb83-P

(showing $2.3 billion of federal funds across 39 transactions in the previous 12 months)

(Exhibit 4); Grant Management, http://web.mta.info/mta/grant/  (listing over $300 million in

Federal Transit Administration grants for Fiscal Year 2019 for 4 MTA projects alone) (Exhibit

5); Eye on the Future: MTA Contract Solicitations, http://web.mta.info/mta/capital/eotf-allagency_new.htm  (scheduled projects receiving federal grants marked with asterisks) (Exhibit 6).

    24.    In order to secure a contract with the MTA, contractors must be on the "Bidders List," a computerized record of vendors who supply the goods and services frequently used by the MTA.  Doing Business with the MTA: A Guide for Contractors and Suppliers, http://web.mta.info/mta/procurement/doingbusiness.htm.  (Exhibit 7.)  The MTA solicits bids and proposals in three ways:

    a.    For small amounts of goods or services (under $10,000), the MTA may contact vendors directly from the Bidders List by telephone or email, rather than advertising.  Contracts resulting from these informal solicitations usually are awarded based on the lowest quote, but the MTA may specify another basis for award.  *Id.*

    b.    The MTA issues an Invitation for Bid (IFB) when a contract is competitively bid using a sealed bidding process.  Vendors submit sealed bids that are opened in a public meeting at the location, date, and time specified in the IFB; the contract is awarded to the qualified vendor submitting the lowest bid.  IFBs are usually for goods or trade services (such as computer hardware and construction).  IFBs over $100,000 are advertised; suppliers on the Bidders List may be notified by mail or by telephone.  IFBs are awarded to the lowest responsive and responsible bidder.  This means that while competitive price is the critical factor, the MTA will also determine if the lowest bidder can responsibly fulfill the contract.  Delivery

performance, quality, and ability to meet bid specifications are all important

considerations in evaluating a bidder's level of responsibility.  *Id.*

    c.   The MTA issues a Request for Proposal (RFP) when a contract is to be

       competitively negotiated.  A selection committee evaluates the proposals and,

       based on the selection criteria set forth in the RFP, negotiates with prospective

       awardees before making a selection and awarding a contract.  RFPs are typically

       for professional services (economic consulting, systems design, management

       services, architectural and engineering services) and major equipment purchases

       such as rolling stock, and have recently been increasingly used for design/build

       contracts where the building entity has responsibilities for both design and

       construction of the project.  For competitively negotiated contracts, a number of

       criteria are considered.  These are specified for each contract and may include

       competitive pricing, demonstrated ability to fulfill the contract, quality of

       samples, previous experience, and contract performance.  The MTA may choose

       to negotiate with one or more vendors as part of the RFP process.  *Id.*

25.    Public work projects, including MTA projects, often run over on time or cost

through no fault of the contractor.  Plans and specifications in MTA projects (as with all

contracting projects) are rarely complete and accurate when bid.  This is particularly true for

MTA projects, which are often underground and/or involve working with aging infrastructure

on an active transit system.  Some changes will almost always be required.  In many instances,

that happens because the MTA elects to make changes to the scope of the original project upon

which the contractor bid.  That could happen because the agency has made a design error or

decides to change the project design or materials for stylistic or other reasons.  These

unforeseen changes add additional cost and time that could not have been accounted for in a contractor's bid. In other instances, conditions unexpected by both parties require a change to the time and/or cost necessary to complete the work—*e.g.*, difficulty obtaining access to work sites, unexpected problems during construction, or unforeseen acts of nature. Sometimes, projects run over in cost or timing because of poor performance by suppliers identified by MTA as sole or limited source suppliers. Because a contractor has no control over any of these factors, it has no way of taking them into account when preparing its initial bid.

26.  The MTA, like virtually all government agencies that award construction contracts, provides a mechanism for contractors to be compensated for unexpected deviations from the original plans that are out of their control. The MTA form contract contains specific provisions that entitle contractors to seek additional compensation and adjustments of the project schedule as a result of these factors. Contractors are entitled to seek a change order to adjust the contract price and/or schedule to account for the impact resulting from these factors. As part of the MTA change order process, contractors submit the anticipated costs and schedule impact. The contract sets forth specific procedures to be followed for the review, negotiation, and processing of these requests. *See* MTA All Agency Procurement Guidelines (Mar. 21, 2018), available at http://web.mta.info/mta/compliance/pdf/Procurement_Guidelines.pdf. (Exhibit 8.)

27.  MTA projects are typically massive infrastructure projects with unique challenges. The New York City Subway, for example, is one of the world's oldest public transit systems. Much of the work needed for the subway must be done underground, and some of the tunnels are more than a hundred years old. Similar challenges are encountered in work on bridges, tunnels, railroads, bus stations, and other types of projects contracted out by the MTA.

As a result, it is not uncommon for there to be multiple requests for change orders during performance of contracts for MTA.

28.     Change orders serve a useful purpose, particularly in public works contracting, because they allow changes in the contract to accommodate unexpected conditions.  This could be due to the age of facilities, concealed conditions (such as existing pipes, degraded components, high water or rock conditions, or an opportunity to modify the design to create a better or more economical facility).  Change orders are vital to the government contracting process and allow the MTA and contractors to keep costs down by providing flexibility.  If contractors had to account for every possible change or unexpected obstacle in their initial bid, the inevitable result would be significantly higher bids.  Change orders allow the parties to adapt to actual conditions, as necessary, in real time.

29.     Over the past year or so, the MTA has taken a number of aggressive positions designed to put pressure on contractors working on public projects.  For example, on February 22, 2019, Defendant Foye sent a letter on behalf of the MTA to all contractor partners stating that due to budget concerns, "the MTA is requiring all vendors providing professional, technical and advisory services to implement a 10% reduction in the current per-hour unit rate."  *See* February 22, 2019 letter from Patrick Foye re: MTA Enterprise-Wide Cost Reduction Initiative. (Exhibit 9.)  And then came the Debarment Statute and regulations.

**The Debarment Statute**

30.     On April 12, 2019, a new MTA debarment law was slipped into the New York State budget bill, Senate Bill S1509c, and passed without public comment.  The bill was codified as N.Y. Pub. Auth. Law § 1279-h.

31.     The Debarment Statute provides that the MTA "shall establish, pursuant to regulation, a debarment process for contractors of the authority that prohibits such contractors from bidding on future contracts, after a debarment determination by such authority, for a period of five years from such determination.  Such regulations must ensure notice and an opportunity to be heard before such debarment determination and provides as a defense acts such as force majeure."  *Id.*

32.     The Debarment Statute also states:  "Such regulations shall *only* provide for a debarment in situations involving a contractor's failure to substantially complete the work within the time frame set forth in the contract, or in any subsequent change order, by more than ten percent of the contract term; or where a contractor's disputed work exceeds ten percent or more of the total contract where claimed costs are deemed to be invalid pursuant by [sic] the contractual dispute resolution process."  *Id.* (emphasis added).

**The MTA Regulations**

33.     On June 5, 2019, the MTA issued "emergency" regulations purporting to implement the Debarment Statute.  *See* N.Y. Comp. Codes R. & Regs. tit. 21, § 1004.1 *et seq.*, (eff. May 22, 2019).  The emergency regulations became effective as of May 22, 2019, and remained in effect for 90 days, until August 19, 2019.

34.     On September 4, 2019, the MTA issued another "emergency" rule extending the emergency regulations another 60 days.  *See* N.Y. Comp. Codes R. & Regs tit. 21, 1004.1 *et seq.* (eff. Aug. 19, 2019).  The extended emergency regulations became effective as of August 19, 2019 and remained in effect until October 17, 2019.

35.    On October 18, 2019, the MTA quietly extended the "emergency" regulations a second time, but that action was not published in the New York State Register until November 6, 2019. *See* 45 N.Y. Reg. 8-10 (Nov. 6, 2019).

36.    The MTA Regulations purport to apply to "all contracts that were in effect on, or entered into after, April 12, 2019." N.Y. Comp. R. & Regs. tit. 21, § 1004.1(a). In other words, the MTA Regulations apply both prospectively to new contracts and retroactively to all contracts that were in existence before issuance of the first emergency regulations—including contracts that predate the Debarment Statute itself.

37.    The MTA Regulations provide that the MTA, "including all contracting personnel therein, *must* debar a contractor if it makes a final determination that the contractor has":

(1) (i) *failed to substantially complete all the work* within the total adjusted time frame by more *than ten percent of the total adjusted time frame*, or

(ii) *failed to progress the work in a manner* so that it will be substantially complete within ten percent of the total adjusted time frame and has refused or in the opinion of the Authority is unable to accelerate the work so that it will be substantially complete within ten percent of the total adjusted time frame, and such refusal or failure is an event of default under the contract; or

(iii) with respect to contracts for goods or services, as to any portion of the goods or services that must be delivered by a deadline, materially failed to deliver such goods or services by more than ten percent of the total adjusted time frame.

(2) asserted a *claim or claims for payment of additional amounts beyond the total adjusted contract value* and one or more of such claims are determined to be invalid under the contract's dispute resolution process or if no such process is specified in the contract in a final determination made by the chief engineer or otherwise by the Authority, and together the sum of any such invalid claims exceeds by ten percent or more the total adjusted contract value.

*Id*. § 1004.3 (emphasis added).

38.    The MTA Regulations define the phrase "total adjusted time frame," as applied to construction contracts, to mean "the period of time that a contract provides for a contractor to

substantially complete the work, as may have been extended or reduced by one or more contract modifications." *Id*. § 1004.2(g).

39.     The MTA Regulations define the phrase "total adjusted contract value" to mean "the original awarded amount of the contract plus or minus the aggregate net amount of all contract modifications." *Id*. § 1004.2(h).

40.     The MTA Regulations define the terms "debar" and "debarment" to mean "the prohibition of a contractor from responding to any contract solicitation of or entering into any contract with the Authority for five years from a final debarment determination." *Id.* § 1004.2(d).

41.     In other words, the MTA Regulations require that a contractor be debarred for five years if it (a) fails to substantially complete all work under the contract by more than ten percent of the total adjusted time frame; (b) merely appears, in the view of the MTA, to be in danger of failing to do so, if such failure is an event of default under the contract; or (c) even *tries* to assert claims for costs in excess of ten percent of the total adjusted contract value that are later deemed to be invalid.  The MTA Regulations do not permit the agency any discretion whatsoever in applying these requirements—even in the face of compelling and undisputed facts showing that the contractor acted in good faith, or that the debarment would be unfair or contrary to the public interest.

42.     To compound matters, the MTA Regulations also permit the MTA to debar not only the targeted contractor but also the "parent(s), subsidiaries, and affiliates" of a targeted contractor, as well as the targeted contractor's "directors, officers, principals, managerial employees, and any person or entity with a ten percent or more interest in a contractor," as well as "any joint venture (including its individual members) and any other form of partnership

(including its individual members) that includes a contractor or a contractor's parent(s), subsidiaries, or affiliates of a contractor." *Id*. §1004.6(b). The MTA may debar these entities and persons even if their relationship to the targeted contractor has nothing to do with the conduct (or even the same contract) that led to the initial debarment.

43.      The MTA Regulations provide scant procedural protections for contractors that are subject to a debarment threat. They require a debarment hearing to be conducted in-house, "by a panel of at least three managerial level employees of the MTA designated by majority vote of the Authority's board; provided that no employee who has taken part in the award of any Authority contract to such contractor or overseen such contractor's performance on any Authority contract may serve on a panel considering the debarment of such contractor." *Id*. § 1004.5(c).

44.      In other words, the persons making the debarment determinations are all MTA employees.

45.      The standard dispute resolution provision in MTA construction contracts, Article 8.03, provides that disputes concerning requests for additional compensation or schedule adjustments are determined by the MTA's own employee, its Chief Engineer. Thus, the underlying decisions regarding claims and project schedule that could lead to and provide the basis for a debarment proceeding are also made by MTA employees. As a result, the entire process—starting with the initial contract dispute resolution provision and continuing through the final debarment determination—is determined solely by MTA employees. At no time are claims heard by or determined by a neutral third party.

46.      Although contractors threatened with debarment have the right to "appear by and be represented by counsel" at the debarment hearing, the MTA Regulations do not provide for

the right to present witness testimony, cross-examine witnesses, or present other forms of evidence.  *Id.* § 1004.5(d).  Worse, the MTA Regulations provide no procedural protections *at all* for affiliates, managerial employees, or joint venturers of the targeted contractor.  Although all of these entities and persons may be debarred as a result of a debarment hearing, they receive no notice of the hearing or threatened debarment, let alone an opportunity to be heard.

**The Debarment Statute And MTA Regulations Violate Federal Law**

47.     On October 7, 2019, Governor Cuomo sent an open letter to Defendant Foye and the MTA Board of Directors explaining the legislative purpose of the Debarment Statute and several other pieces of MTA-related legislation passed earlier in the year.  That letter stated: "The legislation that I put forth and was passed by the Legislature acknowledges the past management failures of the MTA and mandated their correction through legislative action, thus circumventing MTA dysfunction."  *See* Press Room, Governor Cuomo Issues Letter to MTA Chair and CEO Foye Calling For Forensic Audit of MTA Capital Plan, October 7, 2019, *available at* https://www.governor.ny.gov/news/governor-cuomo-issues\-letter-mta-chair-and-ceo-foye-calling-forensic-audit-mta-capital-plan.  (Exhibit 10.)

48.     The legislation and regulations that were purportedly aimed at "circumventing MTA dysfunction" have created a great deal *more* dysfunction for contractors and other vendors, other states, and federal law.

49.     The Debarment Statute and MTA Regulations are being applied retroactively, to contracts that predate their enactment.  As such, they are upsetting the settled contractual expectations of contractors and engineers who bid on MTA projects with a clear understanding of their right to request change orders and of the contractual provisions governing completion of the project.  Contractors and design professionals bid on existing MTA projects based on then-

existing rights to request change orders and schedule adjustments, as set forth in the contract documents upon which they bid. These bidding parties had no opportunity to make appropriate provisions in their bid for the MTA Regulations, which radically affect their contractual rights. If they had known the MTA Regulations were going to apply to current contracts, contractors and engineers may have decided that the current contract terms were too unfair and risky and that it was not in their interest to bid the project at all.

50.    The Debarment Statute and MTA Regulations are wildly out of step with other debarment requirements around the country. Most other debarment statutes and regulations require wrongful conduct by a contractor or that agencies consider mitigating factors and/or motive before a contractor may be debarred. *See, e.g.*, 48 C.F.R. § 9.406-1 ("The existence of a cause for debarment, however, does not necessarily require that the contractor be debarred; the seriousness of the contractor's acts or omissions and any remedial measures or mitigating factors should be considered in making any debarment decision."); 2 C.F.R. § 180.860 (listing "mitigating and aggravating factors that the debarring official may consider" when "appropriate in light of the circumstances of a particular case" for federal administrative agencies and instructing that the "existence or nonexistence of any factor" is "not necessarily determinative"); Model Procurement Code 9-102(2)(d)(ii) (Am. Bar Ass'n 2000); N.J. Admin. Code § 17:19-4.2(a)(3) ("All mitigating factors shall be considered in determining the seriousness of the offense, failure or inadequacy of performance and in deciding whether debarment is warranted.") ("[F]ailure to perform or unsatisfactory performance caused by acts beyond the control of the contract shall not be considered to be a basis for debarment."); 62 Pa. Stat. and Cons. Stat. Ann. § 531(a) ("In making the decision of whether to debar a person, the head of the purchasing agency shall take into consideration the seriousness of any violation and

any mitigating factors."); Mass. General Laws ch. 29 § 29F(g) ("In determining whether to debar a contractor, or the period of a debarment, all mitigating facts and circumstances shall be taken into consideration.").

51.     In contrast, the Debarment Statute and MTA Regulations do not require any wrongful conduct by the contractor or permit consideration of mitigating factors or allow inquiry into whether the contractor, engineer, or other vendor acted in good faith.  MTA authorities *must* debar a contractor, consultant or supplier once a determination is made that the contractor exceeded the statute or regulation's schedule or claim thresholds.  No consideration is given to why a project went longer or whether a claim for a cost overrun was put forth in good faith.  Nor is any consideration given to whether the contractor has taken steps to prevent schedule and cost overruns in the future.

52.     As a result, the Debarment Statute and MTA Regulations create a draconian regime where a contractor operating in good faith may be debarred for merely exercising its express contractual rights to request additional time or costs due to changes necessitated by the MTA or a third party.

53.     Debarment is the death penalty for contractors.  Across the country, public and major private owners routinely inquire about a bidding contractor's debarment history as part of their RFP and procurement processes.  A "yes" answer to this inquiry is virtually disqualifying to participation in any large-scale construction contract nationwide.

54.     To compound matters, a recent Executive Order signed by Governor Cuomo mandates that a debarment by the MTA automatically triggers debarment by *all* New York State

agencies.  *See Executive Order Imposing Continuing Vendor Integrity Requirements in State Contracts*, Executive Order No. 192 (N.Y. Jan. 15, 2019) (EO 192).[1]  (Exhibit 11.)

55.     The Debarment Statute and MTA Regulations create an existential and unmanageable risk to contractors, engineers, and other vendors.  The risk of mandatory debarment through no fault of the contractor has a chilling effect on contractors' willingness to submit a change order, forcing many contractors to simply absorb contract costs that should appropriately be borne by other parties (including the MTA).  It is difficult—if not impossible—for contractors to quantify or account for the impacts of these new restrictions when preparing a bid.

56.     Contractors also may be impeded from passing on their subcontractors' claims for additional payment, as doing so could inadvertently trigger a violation of the 10% threshold.

57.     The Debarment Statute and MTA Regulations substantially impair the terms of public works contracts that were in place before passage of both the statute and regulations in stark violation of the Contract Clause of the United States Constitution.  *See* U.S. Const., art. I, Sec. 10 ("No State shall . . . pass any . . . Law impairing the Obligation of Contracts.").

58.     The Debarment Statute and MTA Regulations are also preempted by federal law under the Supremacy Clause.  U.S. Const., art. VI ("the Laws of the United States . . . shall be the supreme Law of the Land.").  Under the competitive procurement requirements imposed by the federal government as a condition of receiving federal grants, the MTA is required to conduct all procurement transactions in a manner providing for "full and open competition."  As a result, the MTA is prohibited from placing "unreasonable requirements on firms in order for

---

[1]   Concurrently with this lawsuit, Plaintiff is filing a separate lawsuit in state court challenging the EO and bringing particularized State Administrative Procedure Act claims against the MTA Regulations.

them to qualify to do business" or taking "[a]ny arbitrary action in the procurement process." 2 C.F.R. § 200.319(a), (d); *see also* 49 U.S.C. § 5325.  The Debarment Statute and MTA Regulations run afoul of these requirements, conflict with federal goals, and stand as an obstacle to achieving federal objectives.  As such, they are preempted by federal law.

59.     Federal law also provides a robust set of debarment regulations that apply to procurement transactions under federal grants and therefore preempt application of the Debarment Statute and MTA Regulations.  For example, the Department of Transportation provides its own policies and procedures that apply to contracts awarded under federal grants, which includes processes for determining whether a contractor should be debarred and causes for debarment.  *See* 2 C.F.R. Part 1200, incorporating by reference 2 C.F.R. Part 180, Subpart H.  Such regulations allow for the debarring official of the agency to consider many factors and exercise significant discretion.  *Id.* § 180.860.  Further, minimal cost and time overruns are not listed as potential grounds for debarment.  *Id.* § 180.800.

60.     The Debarment Statute and MTA Regulations also impose an unreasonable burden on interstate commerce, in violation of the Dormant Commerce Clause.  *See* U.S. Const., art. I, §  8 (providing to the United States Congress the power "[t]o regulate Commerce . . . among the several States").  The draconian debarment regime put in place by the statute and regulations will substantially burden contractors' ability to enter into contracts across the country, thus effectively exporting New York's unreasonable law to other states.

61.     The MTA Regulations also violate the Procedural Due Process protections afforded by the U.S. Constitution.  The MTA Regulations fail to ensure a minimal threshold of procedural protections for those persons potentially subject to debarment determinations. Among other things, the regulations provide for debarment decisions to be made by high-level

MTA officials with particular interest in the outcome of the proceedings, thus denying contractors a fair process; lack procedural safeguards necessary to create a meaningful opportunity for contractors to present evidence and argument in their defense or to be heard on the merits of their claims; and extend potential liability to a "contractor's parent(s), subsidiaries, and affiliates" and other covered persons, but do not offer those affected parties any notice or opportunity to be heard.

62.     The Debarment Statute and the MTA Regulations also violate the Substantive Due Process Clause of the Fourteenth Amendment.  The statute and regulations create an egregious and shocking deprivation of contractors' protected rights.  The Debarment Statute and MTA Regulations threaten to upend an entire industry by mandating compliance with arbitrary, uncertain, and impossible-to-comply-with requirements, left entirely to the discretion of officials who have the obvious incentive to lower their own costs and can now leverage the draconian threats of statewide debarment determinations.

63.     The Debarment Statute and MTA Regulations also violate the First Amendment to the United States Constitution, which guarantees an individual right "to petition the Government for a redress of grievances."  A critical aspect of the constitutional right to petition is the right to raise claims to vindicate legal rights free from undue governmental pressure.  The Debarment Statute and the MTA Regulations impermissibly chill contractors and other vendors from disputing the charges for contract modifications and change orders, or that otherwise arise during the course of performance.

**The Members of Plaintiffs' Member Organizations Will Suffer Irreparable Harm Absent Judicial Intervention**

64.    Absent judicial intervention, contractors, engineers, and other vendors on public works projects—including members of Plaintiff's member organizations—will suffer concrete and imminent harm.

65.    The threat of debarment is not merely hypothetical—it is very real for New York contractors and engineers.  The new contracting regime creates an unreasonably high risk of debarment and injects significant uncertainty into government contracting.  Under the new regime, a contractor may have a good faith belief that it is entitled to a price or schedule adjustment pursuant to the contract's change order provisions due to design changes that have been made by the MTA, unforeseen conditions that have been encountered, or factors beyond its control.  However, if the contractor exercises its contractual rights and submits a request for a change order, but the MTA disagrees with the relief requested (rightly or wrongly), the contractor could face mandatory debarment for five years—regardless of whether it acted in good faith.

66.    The new debarment requirements will have a chilling effect on a contractor's willingness to submit even reasonable change orders, even when necessitated by actions of the MTA.  Instead, contractors working for the MTA will have to absorb more costs associated with budget overages that are completely out of their control.  The new debarment requirements also will make it difficult if not impossible for contractors to engage in joint ventures, or to hire engineers or managerial employees, given the risks imposed on such entities and persons.  It also will make it harder for contractors to work with subcontractors, whose claims are typically passed along to MTA through their associated contractors.

67.     At a recent MTA board meeting relating to accessibility upgrades at the 170th Street Station in the Bronx, MTA board members acknowledged that three contractors declined to submit final bids in the two-step bidding process because of the "excessive risk" inherent in the MTA's proposed contract terms.  MTA officials confirmed the debarment policy was to blame.  The firms had been pre-qualified to bid because of their favorable, relevant experience on MTA agency projects.  Yet they were unwilling to do so in light of the inherent risks presented by the unlawful Debarment Regulations—risks that threaten all public work contractors so long as the challenged debarment policies remain operable.

68.     Government contracts are the livelihood of many New York contractors, and the inability to bid on state public projects could effectively put a public works contractor out of business.

69.     The effects of debarment are not limited to future MTA contracts.  Thanks to EO 192, debarment by the MTA now means debarment for the purposes of all state contracts. Moreover, the consequences of a debarment reach beyond New York.  Debarment by MTA has far-reaching implications for contractors who work with other states.  In order to bid for most public and private contracts nationwide, a contractor must indicate whether it has ever been debarred from contracting in another state.  It is almost impossible to overcome a positive answer to this question.  As such, a debarment by the MTA will mean, essentially, a nationwide prohibition on future work—effectively putting the targeted contractor out of business.

## COUNT I
## (CONTRACT CLAUSE—U.S. CONST. ART. 1, § 10, cl. 1)
### (Debarment Statute and MTA Regulations)

70.     AFFECT re-alleges and incorporates by reference the foregoing allegations of this Complaint as if fully stated herein.

71.     Article I, Section 10 of the United States Constitution provides: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts."

72.      Members of AFFECT's member associations have entered into a number of public works contracts with the MTA, many of which predate the Debarment Statute and remain in existence.

73.     The Debarment Statute and the MTA Regulations apply not only prospectively, to contracts not yet in place, but also retroactively, to contracts predating their existence. AFFECT's members had and still have contractual obligations with State and MTA entities whose terms were set prior to these legal and regulatory changes.

74.     By capping the ability of contractors to submit change orders or request extensions of the contract term, Defendants have effectively rewritten and substantially impaired existing MTA contracts.

75.     There is no significant and legitimate public purpose that justifies upending contractors' *ex ante* expectations in this fashion.

76.     The result is an unconstitutional State impairment of the obligation of contracts in violation of the Contract Clause under 42 U.S.C. § 1983.

77.     As a direct and proximate result of Defendants' violation of their constitutional rights, AFFECT and AFFECT's members have already been harmed and will suffer further irreparable harm in the absence of injunctive relief.

## COUNT II
## (SUPREMACY CLAUSE—U.S. CONST. ART. VI)
### (Debarment Statute and MTA Regulations)

78.     AFFECT re-alleges and incorporates by reference the foregoing allegations of this Complaint as if fully stated herein.

79.     The Supremacy Clause in Article VI of the United States Constitution provides that "the Laws of the United States . . .  shall be the supreme Law of the Land."

80.     The federal "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards," 2 C.F.R. § 200 *et seq.* (Uniform Guidance) establish the requirements that federal grantees must follow when procuring goods and services needed to carry out a federal grant or sub-grant.

81.     Under the Uniform Guidance, while states "must follow the same policies and procedures" they use "for procurements from . . . non-Federal funds," "[a]ll other non-Federal entities, entities, including subrecipients of a state" are bound to adhere to certain baseline federal standards enumerated in the Uniform Guidance. *Id.* § 200.317.

82.     The MTA receives federal grants to fund, or partially fund, a number of public works.  *See, e.g.*, Grant Management, Metropolitan Transportation Authority, http://web.mta.info/mta/grant/ (Ex. 5, *supra*).  The MTA is not a "state" for purposes of the Uniform Guidance. Rather, it is more akin to a "local government", which is excluded from the definition of a "state" under the Uniform Guidance. *See* 2 C.F.R. §§ 200.64, 200.90.  *See A. Esteban & Co. v. Metro. Transp. Auth.*, No. 02 Civ. 3615 (NRB), 2004 WL 439505, at *4 (S.D.N.Y. Mar. 9, 2004).   As a result, the MTA's procurement decisions are subject to the baseline federal standards set forth in the Uniform Guidance.

83.     The Uniform Guidance states that it is federal policy that "[a]ll procurement transactions must be conducted in a manner providing full and open competition."  As a result, "non-Federal entities" are prohibited from placing "unreasonable requirements on firms in order for them to qualify to do business" or taking "[a]ny arbitrary action in the procurement process."  2 C.F.R. § 200.319(a), (d); *see also* 49 U.S.C. § 5325 ("Recipients of assistance under this chapter shall conduct all procurement transactions in a manner that provides full and open competition as determined by the Secretary [of Transportation].").

84.     The Debarment Statue and the MTA Regulations impose "unreasonable requirements" on bidders on public-works projects seeking to qualify to do business and invite "arbitrary action" throughout the procurement process.

85.     The Debarment Statute and MTA Regulations conflict with the Uniform Guidance and stand as an obstacle to achieving the express federal policy of full and fair competition in the procurement process.

86.     The Debarment Statute and MTA Regulations thus violate the Supremacy Clause.

87.     As a direct and proximate result of Defendants' violation of their constitutional rights, AFFECT and AFFECT's members have already been harmed and will suffer further irreparable harm in the absence of injunctive relief.

### COUNT III
### (DORMANT COMMERCE CLAUSE, U.S. CONST. ART. I, § 8, cl. 3)
### (Debarment Statute and MTA Regulations)

88.     AFFECT re-alleges and incorporates by reference the foregoing allegations of this Complaint as if fully stated herein.

89.     Article I, Section 8 of the United States Constitution provides to the United States Congress alone the power "[t]o regulate Commerce . . . among the several States."

90.    The Debarment Statute and the MTA Regulations radically and unjustifiably require the agency to debar all persons who enter into and perform contractual obligations with State and MTA entities, as well as their "parent(s), subsidiaries, and affiliates."

91.    That will have consequences outside of New York as well.  The laws of "more than a dozen states" provide expressly for reciprocal debarment with "specific reciprocity provisions" while many others contain "catch-all language" understood to the same effect.  *See The Practitioner's Guide to Suspension and Debarment*, ABA Public Contract Law Section, Ch. 10.C at 270 (Frederic M. Levy and Michael T. Wagner, eds.) (4th ed. 2018) (discussing Pa. Stat. and Const. Stat. Ann. § 531(b)(9) (2001); Minn. R. 1330.1150, Subpart 2.F; and Mass. Gen. Laws, § 29F(c)(2)).  In these jurisdictions, an MTA debarment may thus trigger a formal debarment preventing out-of-state contracting as a matter of the relevant State law.  Because "there are literally thousands of state and local governmental agencies that have debarring authority," a single debarment carries "the potential for a mass reciprocal-debarment chain reaction."  *See id.* at 269–70 ("The possibility of a reciprocal debarment should be of particular concern to contractors that contract only or primarily with a limited number of state and local governments.").

92.    In addition to those jurisdictions that have formally enumerated reciprocal-debarment rules, "[m]any states, municipalities, and other public entities also routinely require prospective contractors to fill out detailed background-information forms" such that "past convictions or existing suspensions or debarments" must be disclosed even if "such disclosure is not required by statute."  *Id.* at 274.  The effect of an MTA debarment in these situations will be largely the same, as having to disclose the fact of a previous New York debarment serves as

a major red flag that will severely impede if not eliminate outright a contractor's ability to bid on and win out-of-state work.

93. As a result, a debarment in New York effectively creates a *de facto* regime of reciprocal interstate debarment nationwide.

94. To the best of AFFECT's knowledge, no other jurisdiction provides for a debarment determination to be entered in the circumstances New York law now contemplates. That means that government contractors facing debarment for conduct recognized by New York and New York alone (or mere association with such conduct) nevertheless face the loss of potentially all their State and local-government contracts in one fell swoop.

95. The Debarment Statute and MTA Regulations thus threaten to trigger a cascade of debarments across jurisdictions based on the unreasonable debarment triggers specified in the New York Debarment Statute and MTA Regulations, creating an unreasonable debarment regime that stretches extraterritorially.

96. The burden that the State's government-contracting regime imposes on interstate commerce as a result is clearly excessive relative to any putative local benefits.

97. In addition, government contractors who work in multiple jurisdictions face enormous risk from a potential disbarment determination under the Debarment Statute and MTA Regulations—the loss of potentially all their State contracts in one fell swoop. That disproportionately impacts out-of-state contractors and constitutes discrimination against out-of-state contractors. Similarly, large contractors with out-of-state affiliates are disproportionately likely to be affected by the MTA Regulations, which permit debarment of affiliates having no relationship to the conduct leading to debarment.

29

98.     The result is a substantial burden on interstate commerce in violation of the

Dormant Commerce under 42 U.S.C. § 1983.

99.     As a direct and proximate result of Defendants' violation of their constitutional

rights, AFFECT and AFFECT's members have already been harmed and will suffer further

irreparable harm in the absence of injunctive relief.

**COUNT IV**
**(PROCEDURAL DUE PROCESS, U.S. CONST. AMEND. XIV, § 1)**
**(MTA Regulations)**

100.     AFFECT re-alleges and incorporates by reference the foregoing allegations of this

Complaint as if fully stated herein.

101.     The Due Process Clause of the Fourteenth Amendment to the United States

Constitution provides that no State shall "deprive any person of life, liberty, or property,

without due process of law."

102.     Contractors who are members of AFFECT's member organizations have both

liberty and property interests in contracts already entered into and in the full and fair

opportunity to bid on contracts now and in the future.

103.     The MTA Regulations fail to ensure a minimal threshold of procedural

protections for those persons potentially subject to debarment determinations.

104.     The MTA Regulations provide for debarment decisions to be made by high-level

MTA officials with particular interest in the outcome of the proceedings, thus denying

contractors a fair process.

105.     The MTA Regulations also lack procedural safeguards necessary to create a

meaningful opportunity for contractors to present evidence and argument in their defense or to

be heard on the merits of their claims. For example, contractors are not provided the opportunity to present testimony, submit evidence, or cross-examine witnesses.

106.    The MTA Regulations also extend potential liability to a "contractor's parent(s), subsidiaries, and affiliates" and other covered persons, but do not provide for any notice to or opportunity to be heard for those affected parties.

107.    The result is a violation of the Fourteenth Amendment's Due Process Clause under 42 U.S.C. § 1983.

108.    As a direct and proximate result of Defendants' violation of their constitutional rights, AFFECT and AFFECT's members have already been harmed and will suffer further irreparable harm in the absence of injunctive relief.

**COUNT V**
**(SUBSTANTIVE DUE PROCESS—U.S. CONST. AMEND XIV, § 1)**
**(Debarment Statute and MTA Regulations)**

109.    AFFECT realleges and incorporates by reference the foregoing allegations of this Complaint as if fully stated herein.

110.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law."

111.    Members of AFFECT's member associations have both liberty and property interests in contracts already entered into and in the full and fair opportunity to bid on contracts now and in the future.

112.    The touchstone of due process is the protection from arbitrary State conduct. The Debarment Statute and the MTA Regulations reflect an egregious and shocking deprivation of contractors' protected rights.

31

113.   The Debarment Statute and MTA Regulations threaten to upend an entire industry by mandating compliance with arbitrary, uncertain, and impossible-to-comply-with requirements, left entirely to the discretion of officials who have the obvious incentive to lower their own costs and can now leverage the draconian threats of statewide debarment determinations.

114.   Not only do these excessive penalties attach to those who had already entered and were performing contractual obligations with the State, they also potentially extend to their "parent(s), subsidiaries, and affiliates," radically expanding the scope of potential liability.

115.   These threatened consequences, however unjustified, now loom over each and every contractor who does business with MTA.

116.   The result is a violation of the Fourteenth Amendment's Due Process Clause under 42 U.S.C. § 1983.

117.   As a direct and proximate result of Defendants' violation of their constitutional rights, AFFECT and AFFECT's members have already been harmed and will suffer further irreparable harm in the absence of injunctive relief.

**COUNT VI**
**(RIGHT TO PETITION THE GOVERNMENT—U.S. CONST. AMEND. I)**
**(Debarment Statute and MTA Regulations)**

118.   AFFECT realleges and incorporates by reference the foregoing allegations of this Complaint as if fully stated herein.

119.   The First Amendment to the United States Constitution guarantees an individual right "to petition the Government for a redress of grievances."

120.   A critical aspect of that constitutional right to petition is the right to raise claims to vindicate legal rights free from undue State pressure.

121.    The Debarment Statute and the MTA Regulations impermissibly chill contractors and other vendors from disputing the charges for contract modifications and change orders, or that otherwise arise during the course of performance.

122.    Given the excessive stakes that now attach to claims for additional payment, regardless of any case- or context-specific considerations, the Debarment Statute and Regulations will substantially dampen or eliminate altogether affected contractors' right to contest the State's cost and time assessments.

123.    The result is a violation of the First Amendment's Right to Petition under 42 U.S.C. § 1983.

124.    As a direct and proximate result of Defendants' violation of their constitutional rights, AFFECT and AFFECT's members have already been harmed and will suffer further irreparable harm in the absence of injunctive relief.

## PRAYER FOR RELIEF

AFFECT respectfully prays for the following relief:

A.   A declaration pursuant to 28 U.S.C. § 2201 that the Debarment Statute and the MTA Regulations are unconstitutional, unlawful, and improper under federal law;

B.   Temporary, preliminary, and permanent injunctive relief vacating the MTA Regulations and prohibiting Defendants from further implementing, enforcing, or taking any further action in reliance on the Debarment Statute and the MTA Regulations;

C.   An order awarding AFFECT its costs, expenses, and attorneys' fees incurred in these proceedings pursuant to 42 U.S.C. § 1988; and

D.   Such other and further relief as the Court deems just and proper.

33

Respectfully submitted,

/s/ Benjamin A. Fleming /
Benjamin A. Fleming
HOGAN LOVELLS US LLP
300 Madison Avenue
New York New York 10017
Phone:  (212) 918-3283
Fax: (212) 918-3100
benjamin.fleming@hoganlovells.com

Neal Kumar Katyal (pro hac vice pending)
Catherine E. Stetson (pro hac vice pending)
Susan M. Cook (pro hac vice pending)
Joseph W. Gross (pro hac vice pending)
Michael D. Gendall (pro hac vice pending)
Kyle Druding (pro hac vice pending)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
Phone:  (202) 637-5491
Fax: (202) 637-5910
neal.katyal@hoganlovells.com

*Counsel for Alliance of Fair and Equitable
Contracting Today, Inc.*

Dated:  November 25, 2019

## VERIFICATION

I, the undersigned, having read the allegations of the foregoing Verified Complaint, hereby declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the factual allegations asserted in the Verified Complaint are true and correct.

Executed this 25th day of November, 2019.

Robert Wessels

Carlo Scissura

Lou Coletti

Mike Elmendorf

Jay Simson

35